**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: **Timothy L. and Teresa M. Billig,** | : | Chapter 12 |
| | : | |
| | : | Case No. 20-12771 (PMM) |
| | : | |
| **Debtors.** | : | |

---

# O P I N I O N

## I. INTRODUCTION

The Debtors, Timothy Billig ("Timothy")[1] and Teresa Billig ("Teresa") purchased the family farm from Timothy's parents, George Billig ("George") and Nancy Billig ("Nancy" or "Claimant") in 2003. The farm was sold for $1.00, but George and Nancy (the "Parents") took back a mortgage (the "Mortgage") from Timothy and Teresa. The Debtors made periodic but irregular payments on the Mortgage; at some point these payments stopped. This dispute concerns what balance, if any, remains on the Mortgage. The Debtors insist that the Mortgage has been fully satisfied; Nancy, now George's widow, asserts that more than $90,000.00 is owed. Nancy filed a proof of claim (the "Proof of Claim") in this chapter 12 bankruptcy, to which the Debtors objected.

For reasons discussed below, I find that each party satisfied the burden of proof with regard to part, but not all, of the payments made and amount owed. The Objection will be sustained with regard to $81,745.02 and overruled with regard to the remaining $8,764.87.[2]

---

[1] Because the parties all share the same last name, I will refer to each by her or his first name.

[2] Venue in this District and Court is proper pursuant to 28 U.S.C. §§1408 and 1409. Jurisdiction is proper pursuant to 28 U.S.C. §1334(b). This is a core proceeding under 28 U.S.C. §157(b)(2)(B).

1

## II. PROCEDURAL BACKGROUND

The Billigs filed for chapter 12 bankruptcy protection on June 25, 2020. Their Plan of reorganization was confirmed on December 10, 2020 and modified on July 12, 2022. Proof of Claim 6 was filed by Nancy Billig on September 2, 2020 and states a secured claim for a mortgage in the amount of $90,859.09. The Debtors objected to the Proof of Claim, doc. #76, and after an attempt at mediation failed, an evidentiary hearing was held and concluded on October 3, 2023. Teresa, Timothy, and Nancy testified at the hearing.

## III. FINDINGS OF FACT

Based on the credibility of the witnesses and the plausibility of their testimony, and upon review of the relevant evidence and case docket, I make the following findings of fact.

### Background and History

1. At the time of the bankruptcy filing, the Debtors owned a residence and farm called "Billig Farm" located at 7861 Springhouse Rd. in New Tripoli, PA (the "Farm").
2. The Farm, previously owned by the Parents, sits on 89 acres of land. The Farm produced agriculture and raised hogs.
3. The Debtors are married but are in the process of divorcing.
4. The Debtors have two living sons, George and Daniel. Daniel lived on the Farm in a mobile home owned by Nancy.
5. George Billig died on August 9, 2017.
6. Timothy had a close relationship with his father, George, but is not close to his mother, Nancy.
7. George managed the day to day operations of the Farm; Teresa managed the hog operation and was responsible for maintaining the Farm's accounting.

2

8. On September 21, 2019, a fire (the "Fire") on the Farm destroyed two (2) barns on the property and killed more than 4,500 hogs.

### The Mortgage

9. On July 31, 2003, the Debtors purchased the Farm from George and Nancy Billig for $1.00. See Deed attached to Proof of Claim.

10. As part of the sale, the younger Billigs took a mortgage from Nancy and George in the amount of $213,468.03 (the "Mortgage," Ex.B to the Proof of Claim).

11. The Mortgage was not accompanied by a promissory note.

12. The Mortgage contains the following additional terms:

    - Interest would accrue at the rate of 4.59% per year;
    - Payments were to be made annually in the amount of $20,000.00, starting July 31, 2004; and
    - Payments were to continue for 15 years until all payments (totaling $300,000.00) were made.[3]

13. Because the operation of the Farm produced erratic rather than steady income, payments on the Mortgage were made periodically when income was realized (from the sale of potatoes or hogs), rather than on a regular or fixed schedule.

14. More than a decade after the purchase of the Farm, the Debtors took out additional loans in order to fund the development of the hog operation.

15. On December 23, 2014, for consideration of $1.00, the Debtors and the Parents codified an agreement placing the Mortgage in seventh and last position, subordinate to the Debtors' six (6) other mortgages that existed at that time. See Exhibit to the POC at 22.

---

[3]    That total payments amounting to $300,000.00 (15 payments of $20,000.00) implies that interest payments on the Mortgage were not anticipated.

3

16. Similarly, on November 27, 2017, the Parents and the Debtors entered into a Subordination Agreement for consideration of $1.00 pursuant to which the Mortgage would be subordinated to the two (2) mortgages that existed on the Farm at that time. Ex. to POC at 32.

## Other Mortgages on the Farm

17. Fulton Bank, N.A. held a first lien mortgage on the Farm in the amount of $669,503.52. See Proof of Claim no. 4; Plan at doc. #30.

18. The USDA/Farm Services Agency held a secured mortgage in the amount of $294,596.15. Proof of Claim 5.

19. Following a settlement between the Debtors and Nationwide Agribusiness Insurance, insurance proceeds owed as a result of the Fire were paid on April 10, 2023 to Fulton Bank. Doc. #128.

20. The Farm was sold in the bankruptcy free and clear of all liens for $1,200,000.00 on June 20, 2023. Doc. #156 (the "Sale Order").

21. Pursuant to the Sale Order, $120,000.00 of the sale proceeds were held in escrow pending the resolution of this Claim Objection.

## Mortgage Payment History and Details

22. Payments on the Mortgage were usually made by cash and hand delivered from Timothy to George.

23. Pursuant to an oral agreement between the parties, payments were made on an *ad hoc* basis, rather than on a monthly basis.

24. George gave Nancy the cash paid on the Mortgage by Timothy; Nancy used the money to pay bills.

25. Only George received mortgage payments; at no time did Nancy receive payments.

26. Although Teresa did not directly make payments on the Mortgage, she facilitated the payments by depositing checks from customers and obtaining cash from the bank.

27. The parties stipulated that payments were made in accordance with the Mortgage through the end of 2012 in the total amount of $205,000.00.  Objection at ¶6.

28. Following the death of George in 2017, Nancy did not ask the Debtors to continue paying on the Mortgage. Payments stopped at or around that time.[4]

## Accounting of Payments

29. Teresa maintained all records of payments made on the Mortgage.

30. Although Nancy did the accounting for her family, Nancy and George did not keep records of payments made or amounts due on the loan.

31. Teresa's accounting practice consisted of the following:

- Keeping handwritten ledgers of payments made; and
- Maintaining a QuickBooks account

32. The QuickBooks records contained entries titled "less cash," which indicated how much was withdrawn from each deposited check in order to make a mortgage payment to Nancy and George.

33. The original handwritten ledger, as well as certain financial records kept by Teresa, burned in the Fire.

34. Following the loss of the original ledger in the Fire, Teresa created a duplicate ledger (the "Ledger") approximately two (2) months later, using the deposit summaries in QuickBooks.

35. The Ledger includes payments through 2017.

---

[4] As discussed below, I do not credit Nancy's assertion that payments stopped in 2012.

36. Nancy's competing summary of payments made (Claimant, Ex. B) was *not* produced as the result of a meeting between Nancy and Teresa.[5]

### Additional Relevant Facts

37. One of the Debtors' sons lived in the mobile home on the Farm; the mobile home was owned by Nancy.

38. The Debtors built a deck on Nancy and George's property which was valued at $1,500.00.

39. The roof of the mobile home was repaired by the Debtor's son; this repair was valued at $2,110.01.

40. The Debtors installed a water softener worth $2,335.01 to Nancy's lot.

### IV. DISCUSSION

#### A. Standard in Determining Objection to Claim

A proof of claim is deemed allowed unless a party in interest timely objects. 11 U.S.C. § 502(a); Fed. R. Bankr.P. 3001(f). Unless an objector introduces evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim. 4 Collier on Bankruptcy P 502.02 (16th 2023).

If the objector succeeds in overcoming the *prima facie* effect given to the claim, the ultimate burden ordinarily remains on the claimant to prove the validity of the claim by a preponderance of the evidence. Id.

---

[5] At the hearing, conflicting testimony was presented regarding the occurrence of a meeting among Teresa, Nancy, and Nancy's granddaughter which allegedly took place in order to discuss the amounts paid and remaining balance of the Mortgage. According to Nancy, following this meeting, her granddaughter memorialized the payment history in a summary (Ex.B, the "Accounting").
For the following three (3) reasons, I find it more likely than not that this meeting did not take place. First, Nancy had a only a sketchy and not distinct memory of the meeting, not initially recalling whether the meeting took place before or after George's death in 2017; Nancy also was not aware of how or by whom the Accounting was produced. Nor did she recognize the handwritten notation on the Accounting. Second, Nancy presented no testimony or evidence that the Accounting was provided to or confirmed by Teresa. Third, Teresa, who I find to be credible, had neither a recollection of the meeting nor any knowledge of the Accounting. Rather, Teresa recalls simply providing the Ledger to Nancy for review, rather than the occurrence of an accompanying meeting.

The shifting burden with regard to a claim objection is well known. I have previously described the standard:

> A claim that states facts that satisfy the standard of legal liability is *prima facie* valid. In order to move forward, an objector must meet the burden of negating the *prima facie* validity by making an initial showing that the objector has evidence sufficient to refute a central allegation of the claim. The burden then shifts back to the claimant to prove the sufficiency of the claim's allegations by a preponderance of the evidence. The claimant maintains the burden of persuasion. . . .
>
> In the Eastern District, this standard has been elucidated as follows: "if a proof of claim complies with the Rules of Court and is self-sustaining (*i.e.,* it sets forth the facts necessary to state a claim and is not self-contradictory), it is prima facie valid and the objecting party has the burden of producing evidence to refute the claim."

In re Thomas, 626 B.R. 793, 798 (Bankr. E.D. Pa. 2021) (citations omitted).

### B. The Parties' Competing Computations

This is not a quarrel that relies on conflicting interpretations of the law. The dispute, rather, involves competing narratives, but is more precisely defined as a battle of accounting (or lack thereof). So it is important first to set out each side's numbers-- how much the Debtors and the Claimant assert has been paid and remains owed on the Mortgage. This is not an easy task because, to put it bluntly, the records are a mess.

As a starting point, despite the incongruities, the parties managed to agree that the Debtors paid $205,000.00 on the Mortgage through and including 2012. Therefore, the dispute is only about the amount (if any) paid from 2013 through 2017.[6]

After 2012, the Debtors' and Nancy's accounts diverge. The Debtors assert that after 2012 they paid a total of $91,800.00 (through 2017). See Objection. This amount, plus the amounts that are allegedly owed for services and goods provided by the Debtors that were of value to Nancy

---

[6] Testimony regarding how exactly the parties reached an agreement regarding payments made through 2012 would have been helpful, but was not offered.

7

(and not repaid), allegedly means that balance of the Mortgage has been satisfied.[7] Nancy tells a different story and maintains that while the Debtors made payments through 2012, they paid nothing after that time.[8] Therefore, according to the Proof of Claim, more than $90,000.00 is still owed on the Mortgage.

### C. Analysis

As detailed below, based on my determination of the credibility of the testimony offered and exhibits provided, I conclude that the Debtors paid $81,745.02 on the Mortgage after 2012, leaving a balance of $8,764.87.

#### 1. Credibility

Determination of this matter rests in part on whose account is deemed more credible. The Debtors' and Nancy's testimony and evidence is, after all, directly contradictory. Upon consideration of the demeanor, veracity, and consistency of each witness, I determine that the Debtors were more believable.

Teresa was a credible witness. She recalled details and spoke with certainty while at the same time not being hesitant to say that she could not remember a detail or did not understand a question. I also credit the testimony of Timothy, whose account was less detailed and ultimately less relevant to the determination of this matter. But I found Timothy to offer insight into both his relationship with his parents as well as the customary way that payments were handled.

On the other hand, and critically, I do not credit the testimony of Nancy. While she did not appear to be intentionally fabricating memories, I do find that Nancy's inability to remember

---

[7] The Debtors contention rests on the fact that the agreed amount ($205,000.00) plus the additional amount allegedly paid ($91,800.00) is more than $300,000.00, which is the total amount owed on the Mortgage.

[8] Although the Claimant's Accounting (Ex. B) includes a handwritten note indicating that $15,000.00 was paid on the Mortgage in 2018, Nancy testified both that she does not recognize this handwriting and that the Debtors made no payments after 2012. Nancy fails also to explain why the Amortization Schedule attached to the Proof of Claim shows certain payments through 2018.

critical details indicated that she was unsure of what happened. Nancy was at times confused, while at the same time being certain of and or dedicated to stating a certain outcome. For example, Nancy stated both that she did not recall details regarding the payment of the Mortgage and did not know how her (competing) Accounting was produced while at the same time insisting that no payments were made by the Debtors after 2012.

Teresa and Timothy, on the other hand, maintained a specific recollection of the method of payment and manner of accounting.

For these reasons, I find the Debtors' testimony to be more credible than the Claimant's.

## 2. **Burden of Proof**

In determining whether to credit payment for each alleged transaction, I remain cognizant of the legal standard set out above. The Proof of Claim, which was timely filed in accordance with the Rules, is *prima facie* valid and would, absent objection, be allowed. By objecting the Proof of Claim and providing evidence (the statements made in the Objection, as well as the supporting exhibits and testimony at the hearing), the Debtors shifted the burden to Nancy to prove, by a preponderance of the evidence, that the factual allegations set out in the Proof of Claim are valid. The burden initially lies with the Debtors to prosecute their Objection and ultimately rests with Nancy.

## 3. **Cash and Checks**

As stated, Nancy asserts that no payments were made after 2012 while the Debtors assert that *many* payments were made from 2012 through 2017. The Debtors provided several exhibits purporting to show evidence of the payments. According to the Debtors, and as outlined above, their practice was to make most payments on the Mortgage in cash directly to George. Some

9

payments, however, were also made by checks. Both types of payments, according to the Debtors, were specified in the Ledger and also in the QuickBooks account.

The Debtors' exhibits are not the model of clarity; some of the writing is simply illegible and what is discernable does not, to be sure, provide a straightforward summary. The submissions also provide inconsistent information (as shown in the chart below). Without mapping each entry on each exhibit, I will summarize the exhibits as follows:

|  | Debtors' Summary (Ex.12) | Total cash shown on Ledger (Ex.6) | Total checks shown on Ledger | Total cash entries as stated in exhibits 7-11 |
|---|---|---|---|---|
| 2013 | $14,000.00 | $4,000.00 | $10,000.00 | $32,500.00 |
| 2014 | $21,000.00 | $17,000.00 | $4,000.00 | $42,400.00 |
| 2015 | $25,500.00 | $23,500.00 | $2,000.00 | $23,500.00 |
| 2016 | $24,800.00 | $20,000.00 | $4,800.00 | $29,320.00 |
| 2017 | $6,500.00 | $3,000.00 | $3,500.00 | $3,000.00 |

*Analysis of Cash Transactions*

As stated, from the time that the Mortgage was executed in 2003, the Debtors made most payments by way of hand delivery of cash from Timothy to George. Teresa facilitated these transactions through her banking practice, which included withdrawing a certain amount of cash (usually $2,000.00 or more) when depositing a payment from a customer for goods sold (usually potatoes or hogs). See Findings of Fact 24, 26.

Critically, Nancy did not dispute that these cash payments were the regular, established course of dealing between the parties, nor did she deny having received such payments up to and

through 2012.  Nancy's assertion was – generally - that all payments (including the cash handover) suddenly stopped in 2012 (five (5) years before George died).

I will allow all the cash payments documented in the Ledger for the following three (3) reasons.  First, as noted, I found Teresa and Timothy to be credible witnesses. Their description of the payments of certain regular sums of cash directly from Timothy to George was both detailed and convincing.

Second, Nancy was not credible on this point.  Her contention is that the cash payments were made by Timothy and Teresa up to and until 2012 and then abruptly and randomly stopped. This explanation – that the established pattern of dealing between the two (2) parties ceased without explanation or reason some eight (8) years before the bankruptcy filing- is too convenient and self-serving to be believed, particularly in light of credible evidence to the contrary.  Further, the Debtors' account that the payments stopped by 2018 makes more sense, given that the cash was routinely given to George, who died in 2017.[9]

Third, even if I were to believe Nancy's testimony that no payments were made after 2012, I would likewise have to believe that most of Teresa's Ledger and corresponding QuickBooks accounting are fabricated.  That also does not ring true, given Teresa's supporting testimony.

For all these reasons, I will credit all records of cash payments on the Ledger, the total of which is $67,500.00.  In doing so, I have considered the fact that the QuickBooks record of cash withdrawals does not correspond precisely to the cash payments documented in the Ledger. However, each payment noted in the Ledger is supported by a corresponding entry in

---

[9] The fact that Nancy did not make a formal demand on the Debtors is not, as Nancy suggests, odd.  The Mortgage was voluntarily subordinated, meaning that the parties agreed that payment on the Mortgage was not a priority.  Also, the Mortgage was a loan between parents and child; a formal demand letter might not have been the choice communication.

11

QuickBooks.[10] Further, reconciliation of any discrepancies between the two (2) documents would work in favor, not against, the interests of the Debtors. In other words, there are more cash entries noted in QuickBooks than on the Ledger, lending support for the conclusion that the cash payments denoted on the Ledger are a careful and accurate accounting of what was actually paid to Nancy and George.

*Analysis of Payments Made by Check*

In addition to the cash payments, the Ledger shows that certain payments were made on the Mortgage by check. The following chart details these check payments:

|  | Total of checks shown on Ledger | Amount of each check shown on Ledger | Check number | Date in Ledger |
|---|---|---|---|---|
| 2013 | $10,000.00 | • $10,000.00 | 1393 | 12/10/13 |
| 2014 | $4,000.00 | • $500.00 | 1427 | 2/6/14 |
|  |  | • $300.00 | 1428 | 2/6/14 |
|  |  | • $400.00 | 1478 | 3/21/13 |
|  |  | • $1,600.00 | 1632 | 10/8/14 |
| 2015 | $2,000.00 | • $2,000.00 (to "cash") | 6939 | 5/22/15 |
| 2016 | $4,800.00 | • $4,800.00 | 2240 | 11/30/16 |
| 2017 | $3,500.00 | • $1,500.00 | 7126 | 4/18/17 |
|  |  | • $1,000.00 | 7168 | 8/11/17 |
|  |  | • $1,000.00 | 7182 | 9/15/17 |

---

[10] This correspondence – i.e. that the Ledger entries are supported by the QuickBooks entries- was not disputed at the hearing.

My analysis of whether to credit each of the ten (10) checks takes into account Nancy's underlying argument that the Debtors' assertions regarding these payments should be discounted because they have not provided evidence of each canceled check (by way of a bank record). While counsel for Nancy is incorrect, or at least inaccurate, that the omission of canceled checks is – as repeated at the hearing- a violation of the "best evidence rule,"[11] the argument that better evidence could have been offered is not wholly without merit. If the Parents received and cashed a total of ten (10) checks, why can't or why haven't the Debtors produced copies of each of these canceled checks? The fact that the Debtors' exhibits include certain but not all relevant bank statements further indicates that the omission of proof of some payments made by check is problematic. Though I find Teresa to have testified credibly regarding the payments made by check, on balance I determine that because the Claimant raises a colorable rebuttal, the Debtors cannot satisfy their burden without corresponding documentation. Therefore, as discussed below, where the Debtors have not satisfied their burden of showing that a particular check was cashed, I will disallow credit for the amount of that check.

---

[11]   Federal Rule of Evidence 1002, sometimes referred to as the "best evidence rule," states that "[a]n original writing, recording, or photograph is required in order to prove its content. . . ." This Rule only applies when a movant seeks to prove the *content* of the writing. Fireman's Fund Ins. Co. v. Stites, 258 F.3d 1016, 1023 (9th Cir. 2001). The Rule does not, however, "require production of a document simply because the document contains facts that are also testified to by a witness." Allstate Ins. Co. v. Swann, 27 F.3d 1539, 1543 (11th Cir. 1994). The point is that an original document, rather than a copy of the document, should be used to prove a document's contents. United States v. Smith, 566 F.3d 410, 413 (4th Cir. 2009).

Here, the Debtors seek to prove that the checks were cashed by the Parents; the content of the writing (*i.e.* the actual words on the face of the checks) is not, *per se* at issue. The fact that not all canceled checks were produced may cause doubt as to the veracity of the testimony, but it is not a violation of the Rules of Evidence. In re Gulph Woods Corp., 82 B.R. 373, 378 (Bankr. E.D. Pa. 1988) ("The fact that a party selects weaker competent evidence instead of stronger competent evidence should not be cause to deny the admission of such evidence under the best evidence rule.")

I will discuss each year in question separately.

*2013*

The Ledger states that one (1) check in the amount of $10,000.00 was paid on the Mortgage in 2013. The Debtors support this contention with supplemental Exhibit 7. This Exhibit is a screenshot of a QuickBooks entry showing that check number 1393 in the amount of $10,000.00 cleared on December 10, 2013. However, corresponding proof that check 1393 was actually cashed was not offered. Because the Debtors fail to provide evidence that of the canceled check, this payment will not be credited.

*2014 and 2015*

The Debtors' Exhibits 8 and 9 are copies of QuickBooks accounting for 2014 and 2015 and fail to include evidence of the five (5) checks purportedly paid to the Parents during that time. Because the Debtors have failed to meet their burden of proof with evidence demonstrating that the checks were written and cashed, these amounts ($6,000.00 total) will not be allowed.

*2016*

The Ledger states that one (1) check was paid to Nancy and George in 2016: check no. 2240 on November 30, 2016 in the amount of $4,800.00. The Debtors provided evidence that this check was cashed by Nancy and George. See Ex. 10 at 75 (unpaginated) (showing check 2240 as an "over the counter check") and Ex. 10 at 79 (copy of the canceled check made out in the amount of $4,800.00 to George and Nancy). The $4,800.00 will therefore be credited and the Objection sustained with regard to this check.

Before moving on, I note two (2) details regarding the course of dealings between the parties as evidenced by an examination of the Debtors' 2016 banking records (Ex. 10). First, while a copy of the canceled $4,800.00 check is provided, the related transaction (Ex. 10, p.75) shows

14

that the check was "over the counter." While the meaning of this phrase is not clear from the papers, it may be that the notation of "counter check" indicating that the payees (George and Nancy) cashed the check at the bank upon receipt. See In re Bay Vista of Virginia, Inc., 428 B.R. 197, 224 (Bankr. E.D. Va. 2010) (over the counter check similar to cashier's check).

Second, the banking statements contained in Exhibit 10 show that nine (9) additional checks each made out to George Billig for either $500.00 or $600.00 were cashed in 2016.[12] The fact that these checks – totaling payments of $4,900.00 - do not appear on the Ledger suggests both that the course of dealing between the parties was complicated (what were the payments for?) and that the Debtors did not seek to fabricate payments (if so, why not include these too?).[13]

*2017*

The Ledger contains three (3) entries for checks paid during 2017. The corresponding bank statements show that, in fact, three (3) checks for the amounts and date shown were canceled. However, these checks were each made out to "cash," rather than to Nancy and George. See Ex. 11, pgs. 3, 9, 12 ("over the counter"), 16, 17, 19 ("over the counter"), 20, 23, 27 (unpaginated).

The 2017 records contain the same patterns as the 2016 statements. That is, certain checks are deemed "over the counter") (checks 7168 and 7182), implying but not proving that they were cashed upon receipt. And the banking statements further show that at least nine (9) checks in the total amount of at least $5,400.00 were made out to and cashed by George but not listed as payments on the Ledger, suggesting both that the Debtors were careful in delineating which were payments on the Mortgage (as opposed to payments money transferred for some other reason) and that the Debtors were truthful in including – and excluding – payments made to the Parents. While

---

[12]    See Exhibit 10 pgs 5, 2, 4, 32, 34, 69, 71, 81 (unpaginated).

[13]    Again, though I find the Debtors to be credible, I have not allowed each alleged check payment due to the Debtors' failure to satisfy their burden of proof with regard to this portion of the Objection.

15

these 2017 checks present a close call, I conclude that the Debtors have provided sufficient supporting evidence and, therefore, will credit the payments.

For these reasons, I find that the Debtors have overcome their burden with regard to the 2017 checks and will allow the total amount of $3,500.00 as a credit on the Mortgage.

*Sum regarding checks*

The checks allegedly written in 2013, 2014, and 2015 will not be allowed. However, for the reasons discussed, the four (4) checks cashed in 2016 and 2017 will be counted as payments. The total for these checks is $8,300.00.

4. **Credit for non-monetary contributions**

In addition to payments made by way of cash and checks, the Debtors contend that they have not been compensated for certain work performed or purchases made. The Objection specifies these contributions:

- $2,335.01 for water softener for the lot owned by Nancy;
- $2,110.01 for repair work for Nancy's trailer's roof; and
- $1,500.00 for the work on George's deck

Teresa and Timothy offered credible testimony that this work was performed by or on behalf of the Debtors and that they were not compensated for this labor. Nancy failed to offer testimony or evidence to the contrary. Therefore, the total amount of the above listed contributions, $5,945.02 (the "Extra Payments") will be credited to the amount paid on the Mortgage.

### 5. **Interest**

The Proof of Claim states that interest in the amount of $346.20 is due on the principal balance of $90,509.89.[14] This amount will not be allowed because the Claimant failed to establish a duty of the Debtors to repay interest. The parties agree that a promissory note – which would detail the interest rate, loan terms, and due dates for payments- was not executed along with the Mortgage. Testimony at trial further established both that the parties' initial agreement and their course of action were that payments were made by the Debtors in lump sums and at irregular intervals. Therefore, the amortization schedule attached to the Proof of Claim, which contemplates regular, monthly interest payments on the loan, is not an accurate representation of the amounts owed and paid on the Mortgage. The Mortgage was not a traditional instrument between bank and borrower; the parties contemplated a less structured repayment and did not specify or agree to terms of interest. The Objection will be sustained with regard to this portion of the Proof of Claim.

### 6. **Summary of Analysis of Payments**

The Debtors have satisfied their burden of proof and Nancy has failed to rebut the following payments made on the Mortgage from 2013 through 2017:

- Cash payments totaling $67,500.00;
- Checks totaling $8,300.00; and
- Non-monetary contributions totaling $5,945.02

The total is $81,745.02. The Objection will be sustained with regard to this amount and with regard to the alleged interest owed. The Proof of Claim asserts that a principal balance of $90,509.89 is owed. Therefore, $8,764.87 is owed by the Debtors to Nancy and that amount will be allowed as a claim in the chapter 12 bankruptcy.

---

[14] This total amount of $90,856.09 stated in the attachment is $3.00 less than what is stated on the Proof of Claim.

17

## V.  CONCLUSION

The lack of clear or coordinated accounting makes this dispute more difficult to decide but less difficult to understand.  This quarrel – like most family dramas - is not really about money.  The Mortgage was not a traditional document and the corresponding payments were not made or accounted for in a formal manner presumably because, at some point and for some time, parents and children trusted each other.  The erosion of that trust led eventually to the parties' incompatible positions, conflicting testimony, and opposite evidence.

At bottom I find the Debtors' account to be more credible.  The Objection will be sustained in part and overruled in part, as discussed.  An appropriate order follows.

**Date:**   January 3, 2024

*Patricia M. Mayer*
_____
**PATRICIA M. MAYER**
**U.S. BANKRUPTCY JUDGE**